**WESTERN ASSURANCE COMPANY, INC. Plaintiff and Counterclaim Defendant,**

and Carol R. Nemeth, Intervening Plaintiff,

v.

**J.D. CONNORS; Connors Consulting Group, Inc.; J.D. Connors, and/or Connors Consulting Group, Inc., d/b/a Western Assurance Co. of Indiana, J.D. Connors, Connors Consulting Group, Inc., and/or Western Assurance Co. of Indiana, d/b/a Western Assurance Company, Defendants,**

and

Connors Consulting Group, Inc., Counterclaimant and Third–Party Plaintiff,

v.

Martin Nemeth, Third–Party Defendant.

No. IP88–1245C–B/S.

United States District Court, S.D. Indiana, Indianapolis Division.

Dec. 23, 1999.

See also 21 F.3d 431.

Derek L Mandel, Huffer & Weathers, Indianapolis, IN, Brett I Nemeth, Law Offices of Brett I Nemeth, Huntington Beach, CA, for Western Assur. Co.

Brett I Nemeth, Law Offices of Brett I Nemeth, Huntington Beach, CA, for Martin Nemeth.

David C Campbell, Bingham Summers Welsh & Spilman, Indianapolis, IN, for Deloitte & Touche.

Joan Leeb, Laguna Niguel, CA, pro se.

Carol Nemeth, Mountain Center, CA, pro se.

Malcolm C Mallette, Krieg Devault Alexander & Capehart, Indianapolis, IN, for Linda Connors, J.D. Connors, Connors Consulting Group.

Martin Nemeth, Mountain Center, CA, pro se.

R C Richmond III, Sommer & Barnard, Indianapolis, IN, for Star Financial Bank.

## ENTRY AFTER BENCH TRIAL ON DAMAGES

BARKER, Chief Judge.

During the eleven-year pendency of this case, we have expended substantial judicial resources in attempting to distill the nature of the inscrutable business relationship between these parties. Despite benefitting from multiple summary judgment rulings, two opinions from our circuit regarding appealed matters in this case,[1] and an entry by this court determining liability issues, the parties have failed to resolve the question of damages now before us. In managing this lawsuit, we have observed a partnership in collapse and relationships among former partners completely asunder, where adversarialness touches all aspects of their interactions. The parties operated the partnership at issue without regard to usual business forms or disciplines. To come in eleven years after the fact, as the court has been required to do, to try to make order out of chaos has been an almost insuperable challenge. The business was run as one pot of money—personal and business expenditures being commingled and mislabeled (for reasons never explained to us) and sources of income never being segregated or categorized by business entity or unit at time of receipt. It is upon this convolution that we attempt to fashion a damages award in light of the evidence (or lack thereof) adduced at trial.

### Findings of Fact and Conclusions of Law

Plaintiff Western Assurance Co. ("Western") is a California corporation formed in 1979. Western has been placed in bankruptcy (in California) after the filing of this action. Martin Nemeth ("Nemeth") was Western's CEO and sole shareholder at all times relevant to this lawsuit. Defendant and counterclaimant Connors Consulting Group ("CCG") is an Indiana corporation, formed in 1981, that has operated under the business names of Midwestern Assurance Company, Inc., and Western Assurance Company of Indiana. Since 1982, defendant J.D. Connors ("Connors") has been the sole shareholder of CCG. This dispute mainly has involved identifying the nature of the business relationship between Nemeth/Western and Connors/CCG and determining how to apportion profits and losses derived from their collaboration on partnership projects.[2]

We resolved the liability phase of this action by written entry on July 2, 1993, familiarity with which is assumed for purposes of this entry. After a six-day bench trial, we held in that entry that Nemeth/Western and Connors/CCG interacted within a 50/50 constructive partnership until its dissolution in March 1988: "Connors and CCG are entitled to one-half of the profits from all projects on which they collaborated with Nemeth and Western Assurance by contributing services, funds, or goods .... Connors, CCG, Nemeth, and Western Assurance are jointly and severally liable for all debts and obligations of the business projects on which they collaborated." Court's July 2, 1993, Entry

---

1. *Western Assurance Co. v. J.D. Connors,* No. 93–2400, 1994 WL 109267 (7th Cir. Mar.31, 1994) (unpublished); *Western Assurance v. Star Fin. Bank of Indianapolis,* 3 F.3d 1129 (7th Cir.1993).

2. We collectively refer to Nemeth and Western as "Nemeth/Western" and to J.D. Connors and CCG as "Connors/CCG." We also note to avoid confusion that Martin Nemeth's son, Brett Nemeth, represented both his father and the Western bankruptcy trustee at the damages trial. Finally, any claims brought by the intervening plaintiff, Carol Nemeth, have been dismissed from this action.

¶¶ 15–17. Specifically, we characterized much of the testimony in that trial as not credible, but we were able to borrow from Indiana law and discern from the evidence that the parties collaborated on two partnership projects by contributing services, funds, or goods, the FICA recovery program and the hospital recovery program. The FICA program involved assisting clients recover overpayments of FICA taxes to the Social Security Administration.[3] The hospital recovery program involved helping hospital clients recover uncollected charges, such as amounts due from insurance companies. As payment for the partnership's services, it received a portion of the FICA and hospital recoveries. We concluded in our July 2, 1993, entry that a damages trial should go forward "to determine the profits of all projects in which Connors and CCG collaborated with Nemeth and Western Assurance by contributing services, funds, or goods, together with the amount received by each of the parties and the amount to be paid, if any, by one to another, as well as the distribution of the amount in the Court's escrow fund." *Id.* ¶ 27.[4]

We conducted a bench trial on damages on June 28, 29, 30, and July 1, 1999. Based on the preponderance of the evidence, we enter the following findings of fact and conclusions of law.

## I. FICA Recovery Project

Three experts testified at trial concerning revenue generated by the FICA operation. Dennis Faurote, a representative

from Deloitte & Touche ("Special Master"), worked on the FICA accounting ordered by this court. He testified that the Special Master's report compared cash receipts and disbursements relating to FICA activity between July 1, 1982 and March 31, 1989. The Special Master reviewed documentation provided by the parties, which included FICA contracts, bank statements, and canceled checks, and categorized these items (according to bank account) as FICA receipts and expenses, personal advances to and from the parties, and other receipts and disbursements that either did not have sufficient documentation for categorization as FICA related or were disputed as non-FICA related by one of the parties. The Special Master's determination regarding the FICA cash remaining ($349,573) did not adjust for the personal advances that each party either gave to or received from the partnership, nor did it attempt to carve out those receipts or disbursements that lacked supporting documentation or were disputed as non-FICA. Rather, the report took the total "cash-in" to various bank accounts (which included personal advances from the parties to the FICA project and "other" receipts without sufficient documentation to classify as FICA) minus total "cash out" from those accounts (which included advances from the FICA project to the parties, "other" disbursements without sufficient documentation to classify as FICA, and "other disputed" disbursements that one party claimed were unrelated to FICA) to arrive at the cash remaining.[5]

3. The FICA recovery program had ended by some point in 1986, although the partnership continued its efforts to collect revenue from services rendered and actually received payments until approximately 1990. *See, e.g.,* Trial Tr. at 158–59.

4. We created an escrow account to safeguard a portion of the partnership's FICA revenues, which will total $525,388.23 on the January 20, 2000, maturity of the 90–day United States Treasury Bills in which they are invested. We also appointed a Special Master, Deloitte & Touche, to furnish an accounting with respect to the FICA related cash receipts and cash disbursement of Western, CCG, and re-

lated companies for years ending June 30, 1983–1988, and July 1, 1988–March 31, 1989. The Special Master filed its report with this Court on June 30, 1990. The amount in escrow represents six FICA deposits in 1989–90 ($430,511.91) and accrued interest, minus $104,444.39 in distributions to Deloitte & Touche ($103,768.10) and National City Bank ($676.29). Deloitte & Touche has requested payments for additional services rendered.

5. In the majority of instances, the party challenging the FICA expense claims that the expense should be charged to the spending party as a personal advance, which effectively

Not surprisingly, the two subsequent experts who testified, A. Jerald Roman ("Roman") for Nemeth/Western and Charles Connett ("Connett") for Connors/CCG, focus on those "other" receipts and disbursements that lacked documentation or were disputed by the parties as unrelated to FICA.[6] Each expert reviewed the receipts and disbursements in these categories and, with the assistance of their (self-interested) clients, exercised his respective judgment to re-classify the items as a FICA receipt/expense or as an advance to or from one of the parties. Because these "other" items had contributed to the pool of receipts and distributions in the Special Master's overall cash flow, only items reclassified as an advance to or from a party (as opposed to items reclassified as a FICA receipt/disbursement) affected the bottom line regarding the 50/50 distribution of the "cash remaining" in this case.[7] For example, if a $1,000 expense is moved from "other disbursements" to "advances to Nemeth," Nemeth's share of the FICA partnership proceeds would decrease by $500 and Connors' share would increase by that same amount.[8]

Again, as expected, the two experts differed substantially in their opinions as to where the items in the Special Master's "other" categories should go. Nemeth's expert, Roman, reclassifies many of these items as "advances from Nemeth" or "advances to Connors," which significantly increases Nemeth/Western's share of the pot. Likewise, Connor's expert, Connett, reclassifies many items as "advances from Connors" or "advances to Nemeth," which inflates the FICA amount due to Connors/CCG. The experts also reduce the amounts in the "advances to" categories of their respective clients, which also effectively increases their clients' respective take of the FICA proceeds. Roman reclassified the entire amount of the approximately $1.9 million in the three "other" categories of the Special Master's report, while Connett reclassified approximately $1.2 million in the "other" categories and approximately $40,000 in the "advances to Connors" category. The basis for each expert's opinion rests on his personal interpretation of hundreds of canceled checks and bank statement entries, occasionally supported with original documentation (an original invoice or payroll record), and his understanding of each receipt or expense, which often depended on some representation from his client (Connors or Nemeth) as to its nature and purpose.[9]

Aside from our reliance on their judgments, we have little credible, independent evidence to utilize in ascertaining which expenses and receipts legitimately related to FICA and which were personal items

would increase the challenging party's share of the FICA cash remaining.

6. The parties also attempt to adjust some items that the Special Master placed in remaining categories, such as "advances." However, the bulk of the Special Master's classifications, which pertain to approximately $4 million in "total FICA receipts" and approximately $1.8 million in "total FICA expenses" are not challenged by either party. As we have said, the heart of the dispute lies in the parties' re-classification of approximately $1.9 million that the Special Master placed in the three categories "other receipts," "other disbursements," and "other disputed disbursements."

7. The Special Master effectively treated an item in an "other" category as a partnership receipt or disbursement since it flowed into the total FICA cash remaining, which the

parties split evenly. We find this approach particularly equitable in this case given the 50/50 partnership governing the parties' relationship and the general lack of evidence demonstrating that items were not partnership-related.

8. Technically, this hypothetical $1,000 would have been partnership revenue split evenly between the parties, each receiving $500, had the amount not been advanced. In the language of the FICA balance sheet, a $1,000 advance to one party means that the drawing party's share of partnership revenues decreases by $500, while the other party's share increases by $500.

9. The experts generally do not provide these financial records in support of their conclusions or as exhibits to their reports, a fact that heightens the importance of their credibility and methodology in reaching opinions.

beyond the scope of the FICA partnership business. The fact witnesses appearing at trial, i.e. Martin and Carol Nemeth, Linda Connors, Joan Leeb and Richard Bradley, provide us with little reliable testimony. Even putting aside the patent bias of the Nemeths and Connors, their testimony and that of Leeb and Bradley pertains to whether certain individuals were or were not affiliated generally with the FICA business. Such testimony fails to provide any guidance on whether any one specific expense should be considered as FICA-related or as an advance to one party.

When one considers the sheer number of disputed items, the complete absence of accurate and detailed book-keeping, and the contentiousness of this lawsuit, which is characterized by accusations that the other party has squandered partnership funds for personal uses and deliberately altered business records, we are left only with isolated pockets of reliable record evidence upon which to fashion an allocation of FICA funds. Yet, the parties have chosen this course, relinquishing their ability to fix an exact damages amount through settlement, so we proceed with the unenviable task of assessing each expert's opinions, even analyzing specific items that the parties dispute if the evidence permits us to do so.

■ To begin, we afford no weight to A. Jerald Roman's opinion on behalf of Nemeth/Western concerning the FICA project. First, Roman is far from a disinterested witness in this case. He functioned as a sales representative for Western in the 1980's, he admitted his bias in favor of Western at trial, he has a financial interest in Western's success in this litigation, and he even received a personal loan from Martin Nemeth on a previous occasion. Just as importantly, Roman admitted to a number of improprieties while employed as an accountant by MCRB (MCRB provided computer services for FICA auditing), in-

cluding defalcation of corporate funds, among other things. These considerations seriously impugn Roman's credibility and sufficiently deter our reliance on his opinions when re-classifying items in the Special Master's report.

Our rejection of Roman's FICA opinions, however, does not equate to an acceptance of the expert report produced by Charles Connett, a CPA who testified on behalf of Connors/CCG. Connett's opinions do not suffer from the inherent credibility deficiencies in Roman's testimony, but his re-classifications nonetheless must be reasonable and conform to the preponderance of the evidence. Nemeth/Western dispute his methodology and re-classification of certain items, and while the parties' development of these issues is marginal at best, we must, of course, consider the evidence presented to us.

As we have mentioned, Connett primarily re-classified expenses that the Special Master originally categorized as "other receipts," "other disbursements," or "other disputed disbursements." Recall that the Special Master placed items in the "other receipts" or "other disbursements" categories when the parties submitted items that they claimed were FICA-related, but the items lacked sufficient supporting documentation for the Special Master to conclude that the item was, in fact, FICA related.[10] See Deloitte & Touche Report ¶¶ 1–6. Items that the Special Master placed in the "other disputed disbursements" category consisted of any expense that either party contended was not FICA related. For instance, if Connors submitted an expense to the Special Master that he contended was FICA related, Nemeth could dispute that item and claim that it actually served as an advance to Connors, thereby moving the item into the "other disputed disbursement" category.

10. The Special Master's classification of an item into "other receipts" or "other disbursements" did not foreclose the possibility that the item was FICA-related. The Special Master simply did not possess the knowledge or sufficient documentation to draw that conclusion.

Connett reviewed canceled checks and bank statements submitted to the Special Master. He also reviewed original source documents verifying those canceled checks and bank statements, such as invoices and payroll records (if available), in the possession of his clients, the Connors. Because the Connors controlled CCG's accounts, all of which were located in Indiana, Connett had access to original source documents that the Connors provided him for those Indiana accounts. On the other hand, Nemeth controlled Western's accounts, all of which were located in California, and Connett did not review original source documents that may have existed for those California accounts. Based on his review of these records and his assessment of the nature of the expense, Connett re-classified items, providing one of seven general descriptions of the re-classified item, but not offering any justification for the adjustment.

We begin with the "cash receipts" side of the Special Master's report, which Connett adjusts in only one significant respect. He moves $4,420 in an Indiana account from other receipts to advances from Connors, claiming that this revenue resulted from projects occurring prior to the partnership. A comparison of that amount to the Special Master's report indicates that the amount represents an IRS refund to Connors for overpayment of taxes and interest income. Therefore, these items properly qualify as advances from Connors that are unrelated to the FICA project.

An examination of the California accounts, however, reveals an adjustment that Connett failed to consider. Nemeth also received a $2,354 tax refund deposited in an E.F. Hutton account, which the Special Master classified under "other receipts." This amount likewise should be credited as an advance from Nemeth. We have located no other evidence warranting an adjustment to the "receipt" items in Connett's report.[11]

Matters become substantially more convoluted in assessing Connett's adjustments to the "cash disbursements" side of the Special Master's report. It is well established under Indiana law that each partner in a partnership is an agent of the firm that may bind the firm by his/her acts when apparently carrying out the business of the partnership in the usual way. *See Monon Corp. v. Townsend, Yosha, Cline & Price*, 678 N.E.2d 807, 810 (Ind.Ct.App. 1997) ("[F]or the purpose of carrying on its business in the usual way, [ ] an ordinary partnership is liable in damages for the negligence of any one of its members in conducting the business of the partnership."); *Bay v. Barenie*, 421 N.E.2d 6, 9 (Ind.Ct.App.1981) ("[I]t is well established that in a partnership each partner is the agent of the firm and may bind it by his contracts in everything necessary to carry on its business."); Ind.Code § 23–4–1–9(1) (1999) ("Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the

**11.** Roman contended that an additional $85,000 should be reclassified from "other receipts" in California accounts to "advances from Nemeth." Aside from the lack of credibility associated with his opinions, we possess no evidence, much less a preponderance of it, suggesting that these items were advances to the partnership as opposed to some form of partnership revenues. For instance, Roman, in his report, itemizes six deposits in a California account, Crocker National Bank Regular, which total approximately $24,000. He describes each item merely as an "Advance From Nemeth" without explanation. An examination of the Special Master's report demonstrates that it categorized these items as "other receipts," describing the items as:

"Per Nemeth, represents an advance to Western Assurance. No supporting documentation was available." We have no additional documentation or other evidence before us now to alter the Special Master's designation and credit Nemeth with an advance. Instead, we consider it a more equitable division to consider the amounts in the "other receipts" category (which, in fact, may have been FICA-related if the parties had maintained proper records for verification) as partnership revenues divided equally between the parties. Because the Special Master included these funds in the overall FICA cash flow, half of the funds designated as "other receipts" have been credited properly to Nemeth in Connett's report.

execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member bind the partnership ...."). The parties fail to mention this legal framework when arguing over which expenses bind the partnership, a telling omission demonstrative of the degree to which the parties lose sight of the final objective when litigating the minutia of this case.

■ It is undisputed that Martin Nemeth and J.D. Connors both possessed the authority (whether actual or apparent is beside the point for the moment) to conduct partnership affairs and bind the firm by incurring various expenses. As we have said, the parties' "usual way" of carrying on business affairs was to allow each partner unfettered discretion in spending partnership funds. Neither party bothered to supervise or control the other, nor did they attempt to impose financial responsibility on themselves. Nemeth and Connors easily could have implemented a regime to ensure that they only disbursed partnership funds for what they mutually deemed were appropriate partnership expenses, such as by requiring both parties to approve any expense above a certain amount, but they chose not to do so. For either party now to contend that any one expense was "unreasonable" requires us to exact artificial standards of discipline that never governed the usual way the parties conducted their business while it operated. This understanding of the parties' business practices is important; for where, as here, the parties largely have failed to provide

sufficient evidence to characterize any one expense as either unrelated to or beyond the scope of the partnership, we consider it appropriate to presume expenses properly chargeable to the partnership unless a preponderance of the evidence proves otherwise.

Connett's expert report attaches one of seven "codes" to every expense or group of expenses that he re-classifies. The code reflects his independent conclusion on whether a certain expense was FICA-related, but it fails to provide any rationale for his reclassification.[12] Therefore, we must trust his judgment in deciding whether the items falling within any one "code" should be reclassified. As for codes A and D, which pertain to expenses that Connett reclassifies as FICA-related, we are inclined to rely upon his opinions. Specifically, Connett arrived at his conclusions for expenses under Code A by reviewing not just canceled checks and bank statements, but by examining original supporting documentation as well. We afford less weight to Connett's re-classification of expenses under Code D, as he did not review original documentation to reach those conclusions. However, indulging the presumption that expenses are partnership-related, and in light of the absence of any evidence to the contrary, we credit Connett's assessment that these items should be re-classified.

As importantly, Connett does not reclassify any items under these two codes as advances to Nemeth, so the opinions he reaches (especially those in the absence of original documentation) are confined to

12. Code "A" refers to an expense that Connett believed was a "FICA related expense evidenced by cancelled check, bank statement, and original documentation." Code "B" describes his opinion that an item qualified as a "Non–FICA payment—cancelled check/wire transfer and bank statement available, no other documentation available." Code "C" applies to his "Allocation of non-FICA payment(s)—cancelled check, bank statement, and original invoice available." Code "D" refers to an expense that he believed was a "FICA related expense—cancelled check and bank statement available, no

other documentation available." Code "E" describes his opinion that an item was a "Non–FICA payment—cancelled check, bank statement, and original documentation available." Code "F" refers to an item that in his opinion was a "Non–FICA payment—limited checks and documentation available, no allocation made by special master." Code "G" describes his opinion that an item was a "FICA payment—documentation indicated that payee did work in limited time frame only." This last category erroneously reads "*Non*–FICA payment ..." in Connett's report and apparently is a typographical error.

moving expenses from the two "other" categories to FICA expenses (which does not affect the distribution of cash remaining) and reducing approximately $40,000 in advances to Connors. And while shifting amounts from "advances to Connors" to "FICA expenses" definitely increases Connors share of the FICA cash distribution, we are willing to afford Connett the benefit of the doubt when determining whether his clients' expenses are FICA-related.

■ Our willingness to rely on Connett's opinion diminishes substantially, however, when he reclassifies items under Code B, defined as "Non–FICA payment—cancelled check/wire transfer and bank statement available, no other documentation available." Overall, Connett reclassified over $600,000 from the two "other" categories into the "Advances to Nemeth," category, an adjustment that radically decreases Nemeth's share of the FICA distribution. A substantial portion of these reclassifications fall within his Code B designation. Connett automatically characterized an item as "non-FICA," thereby charging Nemeth with an advance, if Connett reviewed a canceled check, bank statement, or wire transfer and could not locate any original documentation. Because Indiana-based Connett did not represent Nemeth, who lived in California, he did not have physical access to supporting documentation nor did he apparently locate such information in materials provided to him. Therefore, even when an individual clearly worked on a FICA-related project, Connett assumed the expense was a personal advance to Nemeth if he could not access original documentation. We find this categorization by omission improper in this case. Furthermore, Connett reviewed a number of Connors' expenses that lacked original documentation (Code D), yet instead of automatically considering these expenses as advances to Connors (as he did with Nemeth), he reclassified many of these items from "advances to Connors" to "FICA expenses." We decline to credit Connett's opinions in any respect regarding items he categorized under Code B.

Instead, as we mentioned above, we consider it a better approach to treat these expenses as valid partnership expenses, which, like revenues, the parties divide evenly, unless the evidence demonstrates that the expenses should be considered personal advances to Nemeth.

With that said, Connors/CCG contends, quite apart from Connett's report, that a number of expenses that otherwise would have fallen into the Code B category should be reclassified as advances to Nemeth. In short, we conclude by a preponderance of the evidence that the following expenses should be classified as advances to Nemeth: $60,000 to Mike Cullen, $100,000 to Phil Brentwood, $25,000 to Management Effectiveness Corporation (Phil Brentwood's company), and $10,002 in payments to Nemeth and "K. Gross" from the Crocker National Money Market account. We have reviewed Connors/CCG's post-trial brief and conclude that the evidence supports the proposition that these expenses (and no others) were more likely Nemeth's personal advances rather than partnership expenses.

Martin Nemeth had a penchant for giving personal loans to his friends. Nowhere better is this illustrated than with his issuance of two checks to Mike Cullen, totaling $60,000. Connors/CCG cites Carol Nemeth's testimony in the California litigation (discussed *infra*) verifying its contention that Martin Nemeth loaned Cullen at least $60,000 to assist Cullen cope with personal problems, such as preventing an apparent foreclosure on his house. This expense constitutes a personal disbursement beyond the scope of the partnership business. It is also clear that even presuming that expenses are partnership-related, the parties never considered or agreed that personal loans would qualify as expenses properly within the partnership's scope. In any event, Nemeth/Western fails to dispute the contention that the $60,000 Cullen received qualified as a personal loan.

Likewise, the evidence compels our conclusion that Nemeth is personally respon-

sible for the $125,000 he gave to Phil Brentwood and his company. Nemeth/Western fails to respond in its post-trial brief to the argument that Nemeth effectively gave partnership funds to Brentwood for personal reasons beyond the partnership business. The parties do not dispute that Brentwood provided consulting and data entry services for the FICA business, and that he properly received some compensation for those services. However, Connors/CCG asserts that Nemeth permitted Brentwood to retain a $100,000 payment for work he never completed and that Nemeth continued to pay Brentwood after Brentwood stopped performing FICA work due to a nervous breakdown. Less than a month after Brentwood received the $100,000 wire from Nemeth (March 1983) he wrote Nemeth a personal letter noting that he had been under extreme emotional pressure for "some time" and that he was on the verge of a nervous breakdown. Brentwood confirmed his withdrawal from the business, yet he requested that Nemeth continue sending him money to assist with his personal problems. Brentwood acknowledged a personal component to their relationship and thanked Nemeth for his generosity: "I know you are reluctant to send any more money Marty but believe me if I could help I would I just can't do it

anymore right now. The next three payments will help me to get back on my feet and to get a[ ] business started which I hope will provide me with a decent income for awhile all of which I owe to you and your generosity." Defs.' Ex. C–3000. Approximately three months after this letter, Nemeth sent another $25,000 check to Brentwood, this time naming his company as the payee.

Nemeth/Western fails either to acknowledge this correspondence or to offer any evidence from Brentwood, or from any reliable source for that matter, that he actually performed FICA-related services in exchange for these payments. The evidence adduced at trial rebuts any presumption that these expenses qualified as valid partnership disbursements, and instead demonstrates that it is more likely than not that Nemeth personally loaned or gave these funds to Brentwood.

Finally, the parties and their experts do not dispute that $10,002 received by Nemeth and K. Gross from the Crocker National Money Market account constituted advances to Nemeth. Accordingly, we find that $195,002, and only this amount, of the Code B expenses identified in Connett's expert report should be moved from the two "other" categories to the "advances to Nemeth" category.[13]

---

13. We find no credible evidence to conclude that any other expense within the Code B category qualified as an advance to Nemeth. We have reviewed the remaining objections that Connors/CCG asserts in its post-trial brief and find them without sufficient evidentiary support. For instance, Connors/CCG objects to payments to Gil Knecht, MCRB, Joan Leeb and members of her family, among others. Yet, these entities/individuals worked on FICA projects, and we are unable to conclude that these disbursements should be treated as Nemeth's personal expenses. For example, Nemeth/Western paid members of Joan Leeb's family to assist in the mundane processing of FICA accounts, a task which could be completed capably by Leeb's mother and daughter. Further, we have located no evidence suggesting that any remaining expenses, such those to MCRB, were personal in nature, unrelated to FICA operations, or otherwise beyond the scope of Nemeth's

agency. While Connors/CCG may dispute whether a given FICA expense was wise, such expenses fall within the scope of partnership business and comport with the haphazard and uncontrolled way that the parties ordinarily conducted partnership affairs. As a final note, we wish to emphasize that neither party necessarily benefits by our hesitance to characterize an expense as an advance in the absence of supporting evidence. Therefore, for instance, while Nemeth may not personally be charged for payroll expenses that lack original documentation, Connors also is not charged for various expenses in the "other" categories that Roman claimed were unrelated to FICA business (allegations also not supported by credible evidence), such as Connors' alleged expenses for a yacht and payments to various individuals, such as Ed John and William Turrene. Instead, like the "receipts" side of the balance sheet, expenses not characterized as advances

Next, we find that Connett properly reclassified the expenses he designates under Codes C, F, and G in his expert report. Expenses under Code C pertain to expenses that he primarily re-classified as advances to Connors. Original documentation supported his conclusions, which mainly benefitted Nemeth. Expenses under Code F, totaling almost $140,000, involved Connett's individual review of phone bills (fiscal years 1983–1988), after which he allocated phone expenses between Nemeth and Connors, which the Special Master did not attempt to do.[14] Expenses reclassified under Code G have no impact on the distribution of FICA revenues, as Connett did not re-classify any items as advances to either party. Rather, in accordance with our presumption that an expense is partnership-related, Connett re-classifies a small number of items as FICA expenses, noting that the particular payee worked on FICA projects for a limited period. Nemeth/Western fails to adduce reliable evidence disputing Connett's classifications under these three Codes, and we accordingly rely upon his expert conclusions in these respects.

The remaining items in Connett's report fall under the Code E designation, which describes Connett's opinion that a disbursement is a "Non–FICA payment, cancelled check, bank statement, and original documentation available." Connett moves eight items from the "other" categories to either the "advances to Connors" or "advances to Nemeth" categories. Connett rendered his opinions on these items after reviewing original documentation, and we agree with seven of his eight classifications. Specifically, he reviewed documents revealing that Nemeth disbursed two checks to payees with no connection to FICA activity, and that he issued additional checks to Blue Cross that did not pertain to FICA operations. The existence of

original documentation upon which Connett basis his opinion, coupled with our independent review of the expenses and the lack of any response from Nemeth/Western indicating their relation to FICA, supports the conclusion that these expenses more likely than not were personal advances to Nemeth. Likewise, we defer to Connett's opinion regarding reclassifications of three disbursements as advances to Connors.

On the other hand, the preponderance of the evidence does not support Connett's conclusion that approximately $45,000 paid to Delta Information Systems ("Delta") should be reclassified as an advance to Nemeth. Connett's testimony indicates that he possessed no personal knowledge about the services Delta performed, as he simply believed that "Delta performed services, I think computer services in the FICA recovery program." Trial Tr. at 652. The evidence demonstrates that Delta completed a substantial amount of FICA computer processing on behalf of Western and CCG, with no evidence suggesting either that Delta performed any personal tasks for Nemeth or that Nemeth had any personal motivations for paying Delta any more than it was due. While Delta may have received payments in excess of 6% of Indiana and Illinois FICA revenue, an amount to which it was entitled pursuant to one contract with the partnership, we have absolutely no basis to conclude that these additional payments were beyond the scope of the partnership or that they were overpayments. Even if such disbursements were overpayments, they still would have constituted expenses chargeable to the partnership, for either party could have monitored the partnership's expenses or implemented any number of controls on the ability of the partners to incur partnership debt beyond certain levels. Moreover, we have

---

(e.g., items that remain in the "other" or "FICA expenses" categories) are split evenly between the parties. We consider this approach proper in light of the evidence, and it also strikes us as equitable under the facts of this case.

14. Even Roman's report allocates $125,000 in phone expenses to Nemeth as an advance.

not located any evidence suggesting either that Nemeth did not have the authority to disburse checks to Delta or that Delta believed that Nemeth lacked such authority. Ultimately, the parties bear the responsibility for the situation they have created. Their failure to regulate the business' purse strings has joined their fate, requiring each partner to share equally in the financial implications of the partnership decisions made by the other, for better or worse. Accordingly, we rely upon Connett's expert opinion only in so far as discussed above, with appropriate adjustments reflected in our final tabulation of the FICA cash distribution to the parties.

Aside from the reports of the two experts, Nemeth/Western also claims that J.D. Connors incurred a number of personal expenses that should be considered personal advances. Many of Nemeth/Western's objections in its post-trial brief are both difficult to comprehend and undeveloped, often failing to identify the specific challenged expenses. Like many of Connors/CCG's objections, Nemeth/Western's contentions suffer from a lack of evidence upon which we can conclude that any one expense should be charged to Connors as an advance. For instance, Nemeth/Western claims that William Turrene and Travis Stewart both received an unspecified amount of partnership funds for performing work related to Connors' business, PCX, Inc. In addition to Nemeth's failure to identify which expenses were unrelated to FICA, the evidence demonstrates that both individuals worked on FICA projects. Both parties recognize William Turrene's significant FICA involvement, and Martin Nemeth testifies that Travis Stewart was an actual employee who suggested that the partnership contribute to political parties in the hopes of advancing favorable FICA legislation. *See* Trial Tr. at 473. Even if these individuals had been involved with PCX, Inc. (Stewart apparently flew to

some location in August 1987 on a consulting trip), Nemeth/Western only evidences one expense related to PCX, Inc., a $288 airline ticket for Stewart.[15] Therefore, only this one expense is chargeable to Connors as a personal advance in respect to these two individuals, with any other expenses qualifying as partnership disbursements.

Nemeth/Western fares no better regarding its allegation that an approximately $5,000 legal expense should be charged to Connors personally. Linda Connors testified that J.D. Connors incurred personal legal expenses, but that Phil Hilger, a partnership employee, also received legal services properly funded by the partnership. Therefore, we have no method to allocate this expense except to rely upon Connett's review of the underlying documentation, after which he classified the expense as a FICA disbursement for Hilger. Our treatment of the expense in this fashion is consonant with our view that, unless proven otherwise, an expense should be regarded as related to the partnership, as the parties granted each other wide-ranging authority to dispense partnership funds without supervision and never restricted the other's authority in respect to third parties.[16]

However, Nemeth/Western identifies two other expenses that do qualify as personal advances to J.D. Connors. Connors issued two checks ($1,528.40 and $400) for personal gifts, which involved Superior Video and Jerry Hart. Connors/CCG acknowledges that since Nemeth was charged for a similar type of gift in Connett's report (a $1,161 advance for an Amfac Hotel bill, Code E), these advances are proper. Hence, we shall increase the advances to Connors by $2,216, the sum of the three items we have identified.

We now have completed what has been an exhaustive (and exhausting) review of

**15.** The parties neglect to identify where, or if, this expense appears in the Special Master's report. For lack of a better alternative, we will reclassify $288 in one of the "other" expense categories as an advance to Connors.

**16.** This evidentiary deficiency characterizes Nemeth/Western's remaining challenges to various expenses, so we refrain from further elaboration on those claims.

the individual items comprising the Special Master's report on the FICA recovery project. However, additional adjustments must be made for items that the Special Master did not include in its report and for calculations that it was not responsible for computing.

First, and most significantly, we must adjust each party's share of FICA cash by the advances they gave to or received from the partnership.

Second, Connors should be charged with a $12,422.22 advance after obtaining a FICA receipt and exchanging it for a cashier's check for home remodeling. The FICA receipt never passed through partnership bank accounts and therefore avoided the Special Master's review. *See* Pls.' Ex. W621; Trial Tr. at 82–84.[17] Connors treated two additional FICA receipts in like fashion ($4,262.31 and $5,386.81), converting them to cashier's checks for home remodeling in December 1984. *Id.* Connors/CCG fails to rebut this evidence, or even to address it for that matter, so this amount ($22,071 for the three checks) should be treated as an advance to Connors.[18]

Third, we must account for the FICA receipts retained by the parties after the completion of the Special Master's report. The partnership apparently received $21,418 in FICA revenue that Nemeth retained, which effectively transforms it into an advance. *See* Connett Report Ex. 1–1.

Fourth, the escrow fund received four FICA deposits from California schools after the Special Master concluded its report, which totaled $239,511.91. *See* Connett Report Ex. 5–1. Since these funds were deposited into the escrow account and did not constitute an advance to neither party, they increase the amount of cash available for distribution and should be divided equally. We also note that in addition to this $239,511.91, the parties deposited into the escrow account $191,000 in FICA revenues. The Special Master has subsumed this amount into its calculation of the FICA cash remaining ($349,-573), so we need not adjust the Special Master's report to account for that $191,-000.

Fifth, we must decrease Connors/CCG's share of the final cash distribution by the amount of FICA cash it retained and did not deposit into escrow. The Special Master concluded that $349,573 in FICA cash remained, an amount that simply represented the difference between total cash-in and total cash-out. However, by pocketing the FICA revenues in both the Indiana accounts ($199,178) and Connors' personal account ($22,711), instead of depositing those FICA amounts in an escrow fund, Connors/CCG essentially has been paid $221,889 of its share of any FICA revenues. Put another way, this $221,889 represented FICA cash that should have flowed into the FICA pot, the distribution of which would depend on a number of factors, such as the advances to/from the parties. Instead of reserving this amount for an appropriate distribution based on amounts due to/from the parties, as he should have done, J.D. Connors simply retained it. For all we know, Connors has expended the entire sum on personal matters.[19]

---

17. Each party apparently maintained personal bank accounts not reviewed by the Special Master, providing yet another suspect and unexplained dimension to the parties' business practices in this case.

18. Nemeth/Western also claims that the Special Master did not include in its report a $8,500 check that Western issued to CCG, making a passing comment that the funds should be treated as an advance to J.D. Connors. Neither party explains the nature of the check, whether the funds were generated by the partnership, or whether those funds were

spent for personal reasons. Our independent review of the record also provides no clarification, so we are unable to conclude that a preponderance of the evidence dictates alteration of the Special Master's report and inclusion of this item into the pool of expenses affecting the distribution of partnership funds.

19. Connors/CCG virtually ignores the fact that these funds have been retained, with its expert, Connett, offering no coherent explanation for why he failed to account in his report for Connors' retention of these funds.

The following table reflects our adjustments to the reports of the Special Master and Charles Connett. We have utilized Connett's report as a baseline simply for convenience, as many of his adjustments to the Special Master's report remain intact. As we have mentioned, our primary adjustment to Connett's report involves the approximately $433,000 he reclassified as advances to Nemeth under the designation Code B. We conclude that Nemeth is entitled to $336,304 of any FICA cash remaining, with Connors due $30,892.

We also refrain in the following table from dividing the amount deposited in the escrow account, as such a determination is premature prior to our knowing precisely the final escrow amount available to the parties. (The escrow fund has been affected both by interest accrual and by disbursements for various expenses, such as the Special Master's partial fee. The final escrow amount also will be affected by future disbursements for the Special Master's remaining fee, this court's administrative costs, and other administrative bank fees.)

FICA Recovery

| Available To/(Due From) | Special Master | Connett | Court Adjustments | Total | Nemeth | Connors to Connett |
|---|---|---|---|---|---|---|
| **Receipts (Cash In)** | | | | | | |
| Total FICA receipts | 3,984,065 | 3,985,416 | 0 | 3,985,416 | | |
| Advances from Nemeth | 288,495 | 288,495 | 2,354 | 290,849 | 145,425 | (145,424) |
| Advances from Connors | 15,150 | 19,570 | 0 | 19,570 | ( 9,785) | 9,785 |
| Other receipts | 328,439 | 227,668 | ( 2,354) | 225,314 | | |
| Transfers in | 5,758,948 | 5,853,948 | 0 | 5,853,948 | | |
| Total receipts | 10,375,097 | 10,375,097 | 0 | 10,375,097 | | |
| **Disbursements (Cash Out)** | | | | | | |
| Total FICA expense | 1,791,844 | 2,187,927 | ( 4,000) | 2,183,927 | | |
| Advances to Nemeth | 360,935 | 986,675 | (283,271) | 703,404 | (351,702) | 351,702 |
| Advances to Connors | 553,425 | 512,780 | 2,216 | 514,996 | 257,498 | (257,498) |
| Other disbursements | 951,979 | 303,736 | 135,730 | 439,466 | | |
| Other disputed disb. | 608,393 | 180,457 | 149,325 | 329,783 | | |
| Transfers out | 5,758,948 | 5,853,948 | 0 | 5,853,948 | | |
| Total disbursements | 10,025,524 | 10,025,524 | 0 | 10,025,524 | | |
| Total FICA Cash Remaining | 349,573 | 349,573 | 0 | 349,573 | 174,786 | 174,787 |
| Adjustment to FICA cash remaining (Connors exchanged 3 FICA receipts for cashier's checks) | | | 0 | 22,071 | 11,036 | 11,035 ( 22,071) |
| FICA receipt retained by Nemeth after Special Master | | 0 | 21,418 | 0 | 10,709 | 10,709 ( 21,418) |
| FICA receipts deposited in escrow after Special Master (four deposits) | | | | 239,512 | 119,756 | 119,756 |
| Subtotal FICA Cash Available To/(Due From) Each Party | | | | | 336,305 | 252,781 |
| Adjustment for Connors' retention of FICA funds in Indiana accounts | | | | | | (221,889) |
| TOTAL FICA Cash Available To/(Due From) Each Party | | | | | 336,305 | 30,892 |

## II. Hospital Recovery Project

The parties diverge significantly in their approaches to valuing the hospital recovery project. Unlike the FICA recovery project, which largely ceased operating before dissolution of the partnership in March 1988, hospital recovery project revenues were increasing steadily when the partnership dissolved. In fact, the hospital project's revenues nearly doubled the year following dissolution, climbing from $651,715 in 1987–1988 to $1,054,126 in 1988–1989, with Connors/CCG continuing to manage the operation for years following dissolution. (Hospital revenue mainly flowed through CCG's accounts in

Indiana, which Connors controlled.) Connors/CCG never attempted to wind up or terminate the hospital project, nor have they claimed to have done so.[20] Of course, Connors/CCG claims that in dividing any hospital business profits or losses, we should look only to the cash flow of the business between its origination and the March 1988 date of dissolution, thereby ignoring any revenues it retained for the years after dissolution. Connors/CCG claims that the hospital business operated at a net loss of approximately $200,000 between 1984 and 1988 (assuming the accuracy of its expert's report), which the parties should share equally.[21] Nemeth/Western rejoins that it is entitled to a valuation of the business as a going concern as of March 1988 since Connors/CCG never engaged in any winding up efforts. Nemeth/Western claim that the hospital recovery project had a positive fair market value of approximately $1 million in March 1988, which the parties should divide evenly. Based upon our review of the facts and the law, we agree with Nemeth/Western that appraising the hospital business as a going concern as of March 1988 is the proper method to calculate the amounts due/from the parties. The accuracy of Nemeth/Western's valuation is another question, however, and one that we will address in due course.

The hospital recovery project is an auditing business designed to assist hospitals recover uncollected charges for services rendered. Western Assurance of Indiana (a d/b/a of CCG) hired auditors to review hospitals' medical records and financial billing statements, in return for which it generally received approximately one-third of the uncollected charges actually recovered. Neither Martin Nemeth nor J.D. Connors personally performed the auditing work. It is undisputed that Connors/CCG failed to wind up the hospital recovery project after partnership dissolution in March 1988, but it also is clear that Nemeth/Western has not attempted to compel liquidation of the business.[22] As neither party is a wrongfully dissolving partner under the facts of this case, we consider Nemeth a retiring partner under Indiana partnership law for purposes of calculating damages. Indiana Code § 23–4–1–42 (1999) provides:

> When any partner retires or dies, and the business is continued ..., without settlement of accounts as between him or his estate and the person or partnership continuing the business, unless otherwise agreed, he or his legal representative as against such persons or partnership *may have the value of his interest at the date of dissolution ascertained,* and shall receive as an or-

20. The record is not entirely clear on the present status of the hospital recovery project, although it is apparent that at least some version of the project continues to operate under the direction of Connors Consulting Network. From 1984–88, the hospital project generated revenues of approximately $1.2 million. Aside from the $1.05 million generated for the year after partnership dissolution (1988–89), Connors fails to supply us with any additional information regarding hospital revenues since that year.

21. Nemeth/Western's valuation expert, Robert Schlegel, offers the sound observation that since the hospital project generated over $1 million in revenue in 1988–89 and paid out over $400,000 in owner's compensation (we suspect to Connors), the business likely had a positive market value upon dissolution the previous year.

22. On March 16, 1988, J.D. Connors sent Nemeth a letter that contemplated the end of their business relationship and purported to account for the totality of CCG's revenues and expenses, with any profits split equally between the parties. *See* Ex. C–62. While this correspondence serves as evidence that the parties operated within a 50/50 partnership that dissolved on that date, it also demonstrates the parties' recognition that the continuing business was a product of their mutual efforts. That neither party has ever attempted to compel liquidation or otherwise wind up and terminate the hospital business simply reinforces our conclusion that Nemeth should be regarded as a withdrawing partner who essentially permitted Connors to continue the hospital recovery project after dissolution.

dinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option or at the option of his legal representative, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership . . . .

Ind.Code § 23–4–1–42 (emphasis added). *See* Uniform Partnership Act ("UPA") § 42.

In other words, when a partnership business continues after a nonwrongful dissolution, this provision requires that the outgoing partner be paid the total value of his/her departing interest at the time of dissolution, including partnership goodwill, and not merely book value. *See* J.W. Callison, *Partnership Law and Practice*, §§ 15.27–9 (1997 & 1999 Supp.); A. Bromberg & L. Ribstein, *Bromberg & Ribstein on Partnership*, Vol. II, § 7.13(b)(1), (c)(1), (f), Release Nos. 4–6 (1998–99 Supps.). In addition to receiving the value of his/her departing interest, a withdrawing partner also is entitled to elect between receiving either interest or profits attributable to the use of his/her interest in the partnership. *See* Ind.Code § 23–4–1–42; Callison, *supra,* § 15.28.

Nemeth/Western contends, in both its trial and post-trial briefs, that this legal regime controls the calculation of damages in this case. Accordingly, Robert Schlegel ("Schlegel"), an expert in business appraisal, testified on its behalf and rendered an opinion regarding the value of the hospital business as a going concern as of mid-March 1988. Connors/CCG completely ignores the existence of Indiana Code § 23–4–1–42, nor does it acknowledge the legal argument that Nemeth/Western is entitled to a valuation of the hospital business since Connors continued the operation without winding up. Instead, Connors/CCG again relies upon its expert, Charles Connett, a CPA, to confine his analysis to the cash flow of the hospital business between 1982 and March 1988, thereby ignoring, for instance, over $1 million in revenue that the hospital business received the year following partnership dissolution. Connett, who is not an appraisal expert, did not consider the hospital business' earning capacity and did not perform any of the traditional methods of business valuation, such as fixed price, book value, or appraisal. *See* Callison, *supra,* § 15.27, n. 232 ("A business's earning capacity is ordinarily the most important measure of its value; since book value reflects the original cost and adjusted worth of assets, it has little relationship to earnings.").

Connors/CCG attempts to avoid accounting for its uninterrupted operation of the hospital business simply by contending that all profits after March 1988 should not be considered partnership business. Connors/CCG reasons that the typical partnership hospital contract contained a one-year term, with the hospital having the right after four months "to evaluate performance of Western Assurance for the purpose of either cancelling" or continuing the agreement. Defs.' Ex. C–3006. Because a hospital could cancel after four months or not renew after the first year, Connors/CCG claims that hospital contracts obtained after dissolution should not be considered sufficiently related to the partnership so as to constitute "built up" value of the partnership, citing *Bopp v. Brames,* 713 N.E.2d 866 (Ind.Ct.App.1999). Connors/CCG concludes by attempting to draw an analogy between a law firm and the hospital business, noting that the hospital business only generated income on a contingency basis. Connors/CCG apparently contends (without expressly saying so) that since dissolution of a law firm generally does not entitle a withdrawing partner to any value for goodwill, Nemeth/Western is not entitled to any compensation for goodwill in this case either. We find these contentions unavailing.

Initially, *Bopp* provides guidance on the proper method to value a dissolved law partnership in the winding-up process, but it proves less relevant where, as here, the business is not a professional partnership (namely, a law or medical practice) and where the partnership *continues operating without any attempt to wind up the busi-*

*ness.* In *Bopp,* the former partner of a law partnership filed suit for liquidation of the business after the partners voluntarily dissolved the partnership and formed their own law firms. There was no dispute that winding up and liquidation occurred in that case, as the former partners did not attempt to carry on the partnership business nor did any partner claim that any goodwill attached to the partnership itself. The central issue was simply how the court should determine the value of the partnership's interest in two contingency fee cases that had been filed, but not resolved, by the date of the partnership's dissolution. Whether one desires to label the dissolved partnership's interest in these two cases as "built up" value or "unfinished business" pending completion of winding up makes little difference for purposes of this case.[23]

The evidence adduced at the damages trial demonstrates that Connors/CCG continued to operate a hospital business that had significant goodwill value as of March 1988.[24] Connors/CCG also retained the partnership's tangible assets since no liquidation occurred. Unlike a law partnership, where some or all of the goodwill may attach to the individual partners rather than to the partnership itself, the hospital business generated income by relying on its reputation, customer base, and insti-

tutional expertise in the delivery of an auditing service. We have no evidence suggesting that either J.D. Connors' or Martin Nemeth's personal characteristics drove the hospital project revenues. To the contrary, neither J.D. Connors nor Martin Nemeth performed the audits essential to the business' success. The fact that a client could cancel its contract with the partnership after four months if not satisfied with the "performance of Western Assurance," or simply decline to renew after one year, demonstrates the importance of the partnership's reputation and the quality of its service. Surely, if the partnership's reputation had not developed favorably, it likely would have lost existing clients and failed to secure new ones. The hospital business strikes us as exactly the type of enterprise that depends upon its good name, institutional expertise and customer base to retain its value as an assembled concern. *See* Pls.' Ex. W2343 (reflecting Western's marketing of its "reputation" and "quality of service" as "cornerstones of our success"). Indeed, Nemeth has acknowledged that since 1988 he has been unable to replicate the hospital business that he originally conceived, as he lacks the resources for start-up costs and has no client base, auditors, or means to train auditors. *See* Pls.'

**23.** In our August 4, 1995, Entry addressing a number of the parties' motions, including both parties' motions for partial summary judgment, we noted that profits earned on unfinished business between dissolution and winding-up are to be shared by the partners. We also concluded that we lacked a sufficient factual record upon which to make a characterization about the nature of the hospital recovery program. Of course, we now have completed a full damages trial, whose purpose was to determine the proper method to divide the partnership's interests. We have learned that Connors/CCG never attempted to wind-up partnership affairs, a fact that makes the unfinished business inquiry largely academic. Moreover, Nemeth is a retiring partner under the meaning of Indiana Code § 23–4–1–42, and as such an appraisal of the hospital business includes the valuation of any goodwill (including earning power and continued business) that may be attached to the partnership itself.

**24.** For an comprehensive definition of goodwill, *see* Bromberg and Ribstein, *supra,* § 713(c)(1), 7:191–92 (footnotes omitted):

Goodwill has a variety of meanings but is generally used in partnership cases to refer to the going concern value of the business, as opposed to the breakup or liquidation value of its separate assets. This going concern value is almost always related in some way to profitability. Thus, goodwill is often measured with reference to the earning power of the business. Goodwill in this sense includes favorable relationships with customers, employment relationships, credit rating, and other aspects of relationships with suppliers, the value of an assembled organization of property, equipment, and personnel, and such relatively objective components as trade name and customer records. The components of goodwill logically depend heavily on the nature of the partnership business.

Ex. W1679 (Nemeth's original proposal for the hospital recovery program); Trial Tr. at 154–57.

Moreover, the partnership itself was gaining institutional momentum as of the date of dissolution, having just doubled its revenues. Of the twenty-five hospitals with contracts in 1987–1988, seventeen continued as Western Assurance clients in 1988–89, contrary to Connors/CCG's suggestion that hospitals declined to renew their one-year contracts. *See* Pls.' Exs. W1595, W851, W2223; Defs.' Ex. C–3037; Trial Tr. at 92. For example, the partnership generated $64,315 in revenue from Bloomington Hospital in 1985–86, $76,195 in 1986–87, $92,804 in 1987–88, and $129,680 in 1988–89. We regard as irrelevant that the hospital auditing business generated income based on a percentage of charges recovered, as the growing revenues that the partnership *actually* received, whether contingency-based or not, provide an accurate measure of the project's goodwill value when attempting to appraise the partnership. In short, we find that the hospital recovery business potentially possessed positive value as a going concern in March 1988, which must be accounted for in determining damages since Connors/CCG has not wrapped up partnership affairs and instead has retained the business and any profits derived from it since March 1988.

■ Having determined that an appraisal of the hospital project as of March 1988 is appropriate under the facts of this case, the question remaining is how to value the hospital business accurately. *See Zeckel v. Paskins*, 625 N.E.2d 1284, 1288 (Ind.Ct.App.1993) (affirming trial court's order for an appraisal of the partnership to ensure that the breaching partner's interest was "ascertained"); Ind. Code § 23–4–1–42. Nemeth/Western's expert, Robert Schlegel of Houlihan Valuation Advisors, specializes in business valuation and testified regarding the fair market value of the hospital project as of March 16, 1988. *See* Pls.' Ex. W3000. We found his testimony credible and his

credentials well-established. In contrast, Connor/CCG's expert, Charles Connett, admitted that he is not qualified to appraise the hospital business, nor did he attempt to do so. Instead, he simply estimated the overall cash flow of the hospital project from April 1982 to March 1988, a methodology that, as we have said, ignores the value of the business as a going concern and is not warranted under the facts and law of this case.

Unfortunately, an accounting of the hospital project's expenses has not been performed, so any calculations dependent upon its expenses are estimates only. However, Schlegel did rely on the following valuable information in appraising the hospital project: (1) the hospital project's annual revenues through 1989, and (2) CCG's overall revenues, expenses, assets and liabilities for fiscal year ending March 31, 1988. The hospital project formed one segment of CCG's overall business and operated out of CCG's Indiana accounts, so the hospital project's expenses, assets and liabilities would account for some portion of these totals for CCG.

Schlegel concluded that the fair market value of the hospital business on March 16, 1988, was $1,057,188. The bulk of this amount emanated from the value he placed on fixed assets and intangible goodwill in a hypothetical transaction ($607,900), and on the hospital program's accounts receivable ($387,956). The remaining value derived from the balance of Schlegel's estimations regarding non-fixed assets, liabilities and equity. We proceed to assess each of these major categories in turn.

### A. Fixed Assets and Intangible Goodwill

Schlegel utilized two independent methods to estimate the value of the hospital project's fixed assets and intangible goodwill: (1) revenues, and (2) seller's discretionary cash flow.

First, Connors/CCG never disputes that an assessment of a business' revenues alone is a proper basis on which to measure the value of a going concern. Schle-

gel had obtained the hospital revenues for the five fiscal years between 1984 and 1989: 1984–85 ($15,582), 1985–86 ($167,427), 1986–87 ($442,916), 1987–88 ($651,715) and 1988–89 ($1,054,126), and noted that this compounded annual growth reflected substantial attractiveness to a hypothetical buyer of the partnership. Schlegel calculated the actual value of the hospital business as of March 16, 1988, by comparing the 1987–88 hospital revenue ($651,715) to 25 actual sales of accounting, auditing and bookkeeping businesses, an accepted valuation methodology. Schlegel concluded that the hospital recovery project, which essentially performed auditing services, qualified as an accounting, auditing and bookkeeping business under the Standard Industrial Classification Code # 8721. Schlegel arrived at a "revenue multiplier" (.93) based on these 25 comparable sales, which simply means that these businesses sold for some percentage of their annual revenues. Schlegel then multiplied the hospital business' annual revenue by this multiplier to arrive at the value of the hospital project's fixed and intangible assets, which includes goodwill implied by all of the following: client base, the trained workforce, related computer programs and audit work checklists, and future potential to springboard new business concepts from the existing business base. He concluded that the "revenue method" of valuation yielded a positive value for the hospital project's fixed and intangible assets of $606,095.

Connors/CCG advances only two arguments to dispute Schlegel's conclusion, neither of which carries convincing force. First, Connors/CCG claims that the 25 comparable sales that generated the revenue multiplier occurred between 1990 and 1998, and therefore these sales automatically should be disqualified from Schlegel's valuation of the hospital business as of March 1988. Yet, Connors/CCG provides no explanation for this position, and Schlegel, an experienced appraiser, states that these business sales provide valuable auditing data under economic and market conditions similar to those affecting auditing businesses in 1988. Moreover, the revenue multiplier is inherently immune from inflationary pressures since it is a *proportion* of revenue to sales price—the value of the dollar is irrelevant. Even so, Connors/CCG has not adduced any evidence suggesting that Schlegel's revenue multiplier was unreasonable or that this methodology generally is unsound or unacceptable in the valuation community.

Second, Connors/CCG relies on its expert, Connett, to conclude that the hospital recovery project should not be compared to the sales of the 25 business designated as "accounting, auditing and bookkeeping businesses" under Standard Industrial Classification Code # 8721. Connett, who does not claim to be a valuation expert, nonetheless speculates without any supporting authority that because the hospital recovery business generates revenues contingent on recovery of uncollected hospital charges, it is somehow materially different than other auditing businesses classified under Code # 8721. Schlegel testified that the hospital business fell within Code # 8721 for valuation purposes, and we have no evidence undermining that conclusion. Also, the contingency nature of recovery does not necessarily affect the business' value in any direction (recovering ⅓ of uncollected charges could actually increase its value). Of course, other businesses classified under Code # 8721 may very well collect fees on a contingency basis as well.[25] In a case such as this one,

**25.** We also note that the growing revenues of the hospital business, including the 1987–88 revenue that formed the basis of Schlegel's opinion, represent income actually received after uncollected charges had, in fact, been recovered. Connors/CCG never disputes the validity of these revenue figures, although it suggests that Schlegel relied on "unsubstanti- ated revenue trends based on" data received from Western Assurance. Defs.' Br. at 31. We find Connors/CCG assertion clearly erroneous, as J.D. Connors and Linda Connors were the sources of the revenue information that Martin Nemeth simply tallied and printed in a reformatted version. *See* Pls.' Exs. W2223, W1595, W851, Trial Tr. 492–496,

where credible evidence is hard to come by, we conclude that Schlegel reasonably relied upon the sales of the 25 auditing, accounting and bookkeeping businesses in attempting to value the hospital project's fixed and intangible assets.

One might conclude at this point that our job is done on this front. We have accepted Schlegel's utilization of the revenue method of valuation to gauge the worth of the hospital project's fixed and intangible assets, and have concluded that a preponderance of the evidence supports his computations and methodology.

Yet, Schlegel also has identified a second method to accomplish the same valuation goal, seller's discretionary cash flow.[26] He testified that he employed this second method merely as a "sanity check" to corroborate his initial findings. Schlegel calculated the seller's discretionary cash flow for the hospital business for fiscal year ending March 1988 ($307,955), compared it to the sales of the same 25 businesses discussed above to arrive at a multiple (1.98), and computed the value of fixed and intangible assets according to this second method ($609,751). Both independent valuation methods yielded remarkably consistent results ($606,095, revenue vs. $609,-751, discretionary cash flow), so Schlegel simply took the midpoint of the two totals to arrive at a final value ($607,900).

As expected, Connors/CCG asserts that Schlegel's discretionary cash flow computation is flawed. Connors/CCG correctly observes that while the parties may have known hospital revenues for 1987–88 ($651,715), no figures have been compiled regarding the expenses for the hospital project for that (or any) year. Therefore, both Schlegel and Connett attempted to approximate those expenses. We are inclined to declare both expert's estimations as simply too speculative, and instead rely upon Schlegel's valuation based on the revenue methodology alone. But the parties have insisted on dwelling on the discretionary cash flow method, so to ensure fairness to Connors/CCG, we will attempt to craft a tolerable calculation of discretionary cash flow under the circumstances. We will then follow Schlegel's lead and adopt the midpoint between that total and the $606,095 total derived from the revenue valuation method.

Schlegel estimated that the hospital project's expenses would be 52.87% of CCG's total expenses for fiscal year ending March 1988.[27] Schlegel reasoned that because the hospital program's revenue ($651,715) represented 52.87% of CCG's total revenue ($1,232,712), the hospital program's expenses, in the absence of any other documentation, could be estimated by assuming that they constituted 52.87% of CCG's total expenses. Schlegel fully acknowledges that this assumption does not involve "precise accounting," but accedes to the esti-

---

498–99. In turn, Nemeth provided this information to Schlegel. Martin Nemeth reviewed the Connors' check registers, totaled hospital deposits made to CCG accounts through fiscal year ending March 31, 1989, and compared his figures against those in the hospital project's revenue ledgers, which Linda Connors provided via her sworn affidavit "under the penalty of perjury." *Id.* To the extent that any information provided by the parties in this case is credible, we regard these revenue figures as such. In any event, Connors/CCG has had ample opportunity to challenge Nemeth's revenue figures, but has not done so, and we have performed our independent corroboration of Nemeth's totals by comparing a random sampling of entries on the revenue ledgers to his totals.

**26.** Seller's discretionary cash flow, also referred to as discretionary earnings, refers to earnings before owner's compensation, depreciation, interest, and taxes. *See* Defs.' Ex. W5001.

**27.** As CCG's accountant, Connett compiled CCG's "statement of operations" for fiscal year ending March 1988, which included CCG's total revenues and expenses. In 1988, at least four different business segments of which we are aware comprised CCG: the hospital recovery project, the FICA recovery project, PCX, Inc., and Bert's Bar. The statement of operations does not delineate between income and expenses for each segment, a fact that has precipitated the parties' dispute about which expenses should be assigned to the hospital project.

mation in the absence of affirmative data on hospital expenses.

Connors/CCG contends that a better estimation of hospital project expenses for fiscal year ending March 1988 is to take the total activity of CCG and remove any expenses that the Special Master reported as related to FICA recovery activities. Connors/CCG reasons that Bert's Bar and PCX, Inc., accounted for minimal cash flow through CCG's accounts for that particular year, leaving only FICA and the hospital project expenses. Therefore, if the FICA expenses are removed from CCG's total expenses for the fiscal year ending March 1988, Connors/CCG argue that only the hospital project expenses would remain. Schlegel characterizes this approach as a "negative assurance," which understandably is not the preferred method to determine a business segment's expenses. Trial Tr. 319–20. This method also fails to account for any expenses of Bert's Bar and PCX, Inc., even if they happen to be minimal, not to mention any other projects on which Connors may have expended funds in 1987–88. Nonetheless, we realize (as do the parties) that calculating damages in this case, at best, involves educated approximations.

Connors/CCG accurately notes that the bulk of the FICA operation had been completed by the 1987–88 fiscal year, which it claims would increase the hospital project's share of CCG's overall expenses and decrease seller's discretionary cash flow. Therefore, Charles Connett estimates hospital expenses by starting with CCG's total expenses for fiscal year ending March 1988 ($868,496), and then removes both FICA related expenses reported by the Special Master ($116,089) and manage-

ment salaries ($175,349). (Recall that owner's compensation is removed from the discretionary cash calculation.) Connett also erroneously failed to remove from hospital expenses clerical wages paid to Linda Connors amounting to $19,061, which changes his final total for hospital expenses to $557,997. *See* Defs.' Ex. C3004. Compared to revenues of $651,715, total positive cash flow (before taxes) from hospital operations is $93,718, which increases to $96,015 when one accounts for an additional $2,297 in hospital revenues. As defined previously, seller's discretionary cash flow is based on pre-tax cash earnings and excludes expenses for depreciation and interest. Therefore, depreciation and interest expenses must be added back to the $96,015 figure (those amounts were included in the hospital project's expense total) to arrive at seller's discretionary cash flow. Adding back the depreciation ($35,614), amortization ($35), and interest expenses ($2,935) results in $134,599 in seller's discretionary cash flow, assuming we adopt Connors/CCG's method of calculating hospital expenses.[28]

We consider Connors/CCG's calculation preferable to Schlegel's pro rata share approach, although we add that both approaches barely pass muster. Schlegel did not have the benefit of the Special Master's report, although we find no fault in his failure to review it since it pertained to the FICA recovery project. Yet, since work on the FICA project apparently had diminished substantially by 1987 (it continued receiving income through 1990 from its share of tax credits that clients eventually received, however), we find it slightly more likely than not that the hospital pro-

---

**28.** Connett fails to add back depreciation, amortization and interest. Also, his total for seller's discretionary cash flow ($45,664) is reduced for payment of income taxes, which clearly is incorrect. Therefore, while we are willing to credit Connett's tabulation of FICA expenses extracted from the Special Master's report ($116,089) when determining the hospital expenses, we find his *valuation* opinions unreliable as they pertain to the component calculations necessary to determine seller's

discretionary cash flow. Moreover, we are assuming for purposes of calculating discretionary cash flow that CCG's total depreciation, amortization and interest expenses are attributable to the hospital project, consistent with Connors/CCG's insistence that the hospital project accounted for almost all of CCG's expenses in 1987–88. Further, Connors/CCG never indicates that these three expenses were attributed to FICA in the Special Master's report.

ject accounted for more than 52.87% of CCG's total expenses. It also appears that the other business segments comprising CCG may not have accounted for a significant amount of CCG cash flow in 1987–88 (unlike prior years), or at least we have no evidence so indicating. Therefore, Connett's deduction of FICA expenses from total CCG revenue likely comes closer to estimating the hospital project expenses than Schlegel's pro rata approach, such that a tolerable approximation of seller's discretionary cash flow is possible.

In sum, we have reduced Schlegel's total for seller's discretionary cash flow from $307,955 to $134,599. Applying the multiple (1.98) he derived from market data, namely the sales of 25 similar businesses, we arrive at the worth of the hospital project's fixed assets and intangibles ($266,506) according to Schlegel's second valuation method, seller's discretionary cash flow. The midpoint between the totals derived from Schlegel's two valuations ($606,095 v. $266,506) leaves us with an estimated value for the hospital project's fixed assets and intangible goodwill as of March 1988, $436,301, which represents $171,599 less than Schlegel's original valuation.[29]

### B. Accounts Receivable

In addition to fixed assets and intangible goodwill, the value of the hospital project depends on its assets and liabilities. One component of assets is accounts receivable, in other words, a debt owed to an enterprise. Schlegel includes $387,956 in outstanding accounts receivable as an asset of the hospital project, an amount whose recovery is not guaranteed. The $387,956 total represents the amount that the hospital segment *would be due* if the hospital actually recovered uncollected patient charges (mainly from insurance companies). *See* Trial Tr. 94–98. Hence, if an insurance company had paid the hospital partially, but elected not to pay the remainder for any number of reasons, the hospital project also would not receive its percentage of the unpaid charges. For example, one hospital ledger sheet indicates that Oakwood Springwell Health Center had a "balance" of $12,931.82, an amount that represented the hospital project's percentage of any payments received by its hospital client, assuming the insurer paid the hospital client in full. *See* Pls.' Ex. C3035. The insurer, in fact, rendered a partial payment, for which the hospital project received its percentage, $7,316.42. However, the ledger also indicates that CCG issued the hospital credits for $5,604.76 and $10.62 as a "write off." Because the hospital would not receive the remaining uncollected charges from the insurer, CCG understood that it would not be paid the remaining "balance" on the ledger sheet. Therefore, it credited the hospital that amount and the balance due reads zero after a two cent adjustment. The $387,956 total in accounts receivable represents the total of these "balances" for seventeen hospital accounts as of the beginning of March 1988.

Unfortunately, the parties fail to provide us with either a percentage or an estimation of uncollected charges that a hospital client typically recovers from an insurance company, even though they generally agree that insurers sometimes fail to pay total amounts due. Linda Connors testifies simply that the recovery percentage "varies from hospital to hospital." Trial Tr. at 98. While some unrecoverable ac-

29. Schlegel originally concluded that the overall value of the hospital project was $1,057,188, which of course included the value of fixed and intangible assets. Thus, the overall value of the project also would decrease by $171,599 to $885,589, or about 16%, assuming no other modifications. When asked during trial how Connett's figure for hospital expenses would affect his conclusion, he stated that Connett's figure would drop the value of the business to about $970,000 or $980,000. He then described the drop as "about 15 percent," which clearly does not characterize the $87,188 difference between $1,057,188 and $970,000 (8.2%). Trial Tr. at 288. Our modification approaches his "15 percent" opinion, although we find both opinions moot since Nemeth/Western fails to offer any calculations or rationale in support of either one.

counts receivable can be expected in virtually every enterprise, we are left to determine if the accounts receivable in this case represent an amount that is reasonably collectable, such that they represent a valid business "asset." Therefore, since the parties have not provided any assistance on the matter, we independently have reviewed each of the seventeen ledger sheets whose balances comprise the accounts receivable total. In particular, we reviewed the degree to which CCG "wrote off" various amounts of the balances due because it determined that the insurer would not render additional payments to the hospital. A consistent pattern of write-offs, compared to amounts actually recovered, would provide some indication of whether a portion of the accounts receivable should not reasonably be considered an asset of the hospital recovery project. We further note that we are attempting to adjust the accounts receivable only for those extreme cases when CCG itself characterizes certain amounts as unrecoverable. Hence, we are not concerned with those occasions where, for instance, a hospital actually receives payment from an insurance company but refuses to pay CCG its percentage for some reason (e.g. bankruptcy)—such are the costs of doing business.

With that said, seven of the seventeen hospital ledgers we reviewed indicate that the respective hospitals received sizable insurance payments, paid CCG large portions of its percentage, and often paid its account in full (Bloomington, Conamaugh, Decatur, Fayette, Floyd, Reid and University Heights). Most importantly for our purposes, CCG issued only minor "write off" credits, if any, compared to the revenues it actually received. The accounts receivable for these hospitals ($41,247) fall squarely within the bounds of a reasonable business asset. The remaining ten hospitals ledgers ($346,709 in accounts receivable) typically reflected a number of write off credits in notable amounts compared to revenues received (occasionally over 10% of revenues received) or demonstrated that the hospital carried balances without ever paying the account in full or without paying CCG comparatively sizable amounts. For instance, Lucy Lee Hospital paid CCG actual payments of $12,317, received $1,486 in write-off credits from CCG (12% of the payments received), and carried an accounts receivable "balance" of $39,752, CCG's collection of which at least depends on whether the insurer pays the hospital. Likewise, the hospital ledger indicating the largest accounts receivable ($129,436), SW Florida Regional, follows a similar pattern. CCG received approximately $251,400 in actual payments from the hospital, it issued approximately $23,400 in write-off credits (9.3% of payments received), and the hospital typically carried an accounts receivable balance over $100,000. Based on our review of the ten remaining accounts, having made similar calculations regarding write-off credits and noting the payment histories, amounts, and balances carried associated with those hospitals, we find that reducing these accounts receivable by $34,671 (10%) properly adjusts for amounts not reasonably collectable.

### C. Other Adjustments to Non–Fixed Assets and Liabilities

Schlegel's final adjustments pertained to estimating which portions of CCG's overall assets, liabilities, and equity belonged to the hospital recovery project. Again, since CCG's assets, liabilities and equity (like expenses) were not broken down according to business segment, Schlegel assumed that the hospital project laid claim to 52.87% of the amounts in these categories, as hospital project revenues in 1987–88 were 52.87% of CCG's total revenue. We conclude for a number of reasons that this pro rata share approach is reasonable in this context (unlike in the expense context) and find no reason to adjust the figures in Schlegel's report any further.

First, Connors/CCG fails to dispute this methodology in respect to estimating non-fixed assets and liabilities and it offers no reasonable alternative. Second, the balance of the assets, liabilities and equity does not affect Schlegel's valuation of the

hospital project substantially—regardless of whether the hospital project's share of the assets and liabilities is adjusted. The vast majority of the hospital project's value rests on its fixed assets and goodwill ($607,900 in Schlegel's report, prior to our downward adjustment) and its accounts receivable ($387,000 in Schlegel's report, prior to our downward adjustment), not the balance of the assets, liabilities and equity. Moreover, even though actual work on the FICA project largely had finished by 1987, thereby decreasing expenses, it (and other CCG business segments) are not necessarily absolved of liabilities (including long-term debt) for that year to the same degree. The FICA project, PCX, Inc., and Bert's Bar all operated in 1987–88 and likely were responsible for their fair share of the accrual of CCG liability. In all, we find that Schlegel's adjustments for assets, liability and equity provide the most reasonable approximation for calculation of damages in this case.

### D. Final Objections and Hospital Calculations

Connors/CCG launches one final salvo at Schlegel's report, contending that he and his staff completed the report too expeditiously and based it on limited procedures. We have reviewed Schlegel's expert report in excruciating detail and found it largely to withstand our critical eye. We find no merit in the contention that we must disregard Schlegel's report because it allegedly is predicated on unreliable methodology.

At the outset, we hasten to observe that none of the four expert reports in this case rise to the level of an audit or full-scope appraisal, not even the Special Master's report. While Schlegel's report technically is considered a "limited procedure valuation," this type of opinion comports with the appraisal industry's accepted practice and custom. We have analyzed the figures provided to Schlegel and his computations, adjusting them where necessary to ensure a reasonable valuation under the facts of this case. Connors/CCG correctly notes that Schlegel and his staff required approximately fourteen billable hours to compile the valuation of the hospital project (not including deposition or trial activities), an amount of time that does not strike us as a fortiori unreasonable given the figures and information at his disposal. Somewhat ironically, Connett states in the opening page of this opinion, where he estimates his professional fees, that he spent approximately thirty hours arriving at his opinions, which included analyses of the FICA project (and reviewing hundreds of documents), the TJTC/EDS project, PCX, Inc., Bert's Bar, and the escrow fund, in addition to his cash flow analysis of the hospital billing segment. (Connett subsequently attempts to increase that figure to fifty hours.) While we confess to spending substantially more time in analyzing this case than both these experts combined, the measure of time itself is not necessarily correlated to the quality of their opinions or the expertise they bring to bear. Our detailed modifications to their reports reflect our careful consideration of the preponderance of the evidence and our best judgment on how to calculate damages most reasonably in this case. Enough said.

To recap, we have adjusted Schlegel's appraisal of the hospital recovery project by a total of $206,270, reducing its fair market value from $1,057,188 to $850,918 as of March 16, 1988. As equal partners, the parties divide this interest equally. As a retiring partner in a business continued by Connors/CCG under Indiana Code § 23–4–1–42, Nemeth/Western is entitled to the value of its interest in the hospital project on the date of dissolution, $425,459. See Ind.Code § 23–4–1–42; Callison, supra; Bromberg & Ribstein, supra; Zeckel v. Paskins, 625 N.E.2d 1284, 1288 (Ind.App.1993). Nemeth/Western also has elected to receive interest on this amount in lieu of profits attributable to the use of its right in the property of the dissolved partnership. Applying a simply interest rate of 6% per annum from March 16, 1988 to December 23, 1999 ($300,-455.64), the value of Nemeth/Western's in-

terest in the hospital project is $725,-914.64.[30] Thus, our final calculations of the amounts due to/from the parties will account for these funds owed by Connors/CCG.

### III. TJTC/EDS

The parties dispute whether the Targeted Jobs Tax Credit/Electronic Data Services Corporation business was a partnership project. Nemeth/Western asserts that Connors/CCG did not collaborate on the project by contributing services, funds or goods. Oddly, Nemeth/Western fails to explain the financial consequences of our entering such a finding, nor does it contest Connors/CCG's position that if TJTC/EDS is considered a partnership project, the parties owe each other a rather insignificant amount ($2,605 due to Connors/CCG). We conclude that the TJTC/EDS operation constituted a segment of the 50/50 constructive partnership and adopt Charles Connett's calculation of the cash amounts due to/from the parties.

The Targeted Jobs Tax Credit ("TJTC") business operated from approximately 1981 through 1987, when it began losing momentum after the loss of its major client, Electronic Data Services Corporation ("EDS"). It functioned as the California counterpart to the hospital project, in that its revenues mainly flowed through Nemeth/Western's California bank accounts. The "Targeted Jobs Tax Credit Program" was designed by Congress to encourage employers to hire disadvantaged individuals from any one of eight groups, including veterans, SSI recipients, or younger adults between the ages of 18 and 24. Therefore, its continued existence (like the FICA project) depended upon annual congressional renewals of the tax credit. The partnership's TJTC operation initially depended on its FICA clients. As a FICA client hired new employees, a representative from Western would contact those employees to determine if they were eligible for a targeted tax credit for their employer. If the employee successfully completed a set of procedures, the employer would earn income tax credits based on wages the employee earned. The TJTC segment typically received approximately one-quarter of any tax credit realized by the employer.

As mentioned, EDS was simply a large TJTC client who initially retained Western's services in 1983, eventually terminating its business relationship with Western on March 31, 1987. *See* Trial Tr. at 122; Defs.' App. Ex. J. Congress failed to pass the 1986 tax bill until the end of that year, which apparently precipitated the decline of the TJTC operation. *See* Trial Tr. at 158–59.

---

**30.** We have chosen this interest rate for a number of reasons. First, Nemeth/Western (and Schlegel), consistently have advanced this rate in their post-trial submissions, and Connors/CCG has not disputed it or suggested an alternative rate. Second, Indiana's Uniform Partnership Act, modeled after the UPA, does not establish a prevailing rate to govern a retiring partner's recovery of interest. Therefore, we find Indiana's statutory and common law on awards of pre-judgment interest analogous, as the purpose of an interest award is simply to compensate a party for the lost use of money. *See* Ind.Code § 34–51–4–9 (1999) (providing for prejudgment interest in civil tort actions and allowing the court to determine a "simple rate of interest" not less than six percent per year and not more than ten percent per year); Ind.Code § 24–4.6–1–101 (1999) (generally governing post-judgment interest on money judgments, but allowing interest prior to judgment as well, and providing for an interest rate of eight percent per year in the absence of agreement between the parties); *Indiana Erectors, Inc. v. Trustees of Indiana Univ.*, 686 N.E.2d 878, 882 (Ind. Ct.App.1997) (recognizing that Indiana common law also recognizes pre-judgment interest awards independent of statutory law); *cf. Travelers Ins. Co. v. Transport Ins. Co.*, 846 F.2d 1048, 1051–53 (7th Cir.1988) (finding that the federal post-judgment interest statute, not state law, governs federal cases based on diversity of citizenship, but recognizing that prejudgment interest is a matter of state law in such cases). The rate we have adopted falls within the range established by the Indiana legislature in its most recent pronouncement on acceptable pre-judgment interest rates (the rationale for awarding interest remains the same even if the case involves tortious conduct). Third, we find this rate equitable under the facts of case, especially where Nemeth/Western requested it.

During its existence, J.D. Connors clearly collaborated on the TJTC project by rendering his services, and he received a portion of the business' profits. He attempted to sell Western's tax credit contracts to potential clients and involved himself in TJTC affairs, evidenced by his November 1984 correspondence with the Director of Human Resources at Mayflower Corporation. *See* Defs.' Ex. C104. Moreover, Martin Nemeth arranged for J.D. Connors to receive at least three sizable EDS checks in 1986 and 1987, instructing him to deposit the checks in a CCG account, retain a portion of the funds, and send the remainder back to Nemeth. Such interaction between Nemeth and Connors hardly reflects any effort by Nemeth either to wall-off the TJTC/EDS project from the other partnership segments or to prevent J.D. Connors from sharing in revenues—quite the opposite. Indeed, the commingled nature of partnership funds and the parties' entangled, disorganized business practices makes it virtually impossible to extract any one business segment from the rest, a fact reinforcing our conclusion to impose a constructive partnership on the entire affair.[31]

As a final matter, we credit Charles Connett's expert opinion regarding the cash available from the TJTC/EDS operation.[32] The alternative requires our reliance on Jerald Roman's opinion, a source we consider not credible. Unfortunately, Roman provided much of the underlying TJTC/EDS source material upon which Connett bases his opinion, but Connett's independent interpretation of that information must suffice for purposes of calculation damages in this case. Accordingly, we find that the TJTC/EDS operation constituted a segment of the equal partnership, and find that Connors/CCG is due $2,605 for its share in that project.

### IV. Judicial Estoppel

One outstanding issue requires resolution before we calculate the final amounts due to/from the parties and disburse the escrow fund. Connors/CCG claims that Nemeth/Western is judicially estopped from recovery of any amounts in the escrow fund because in 1994 Nemeth/Western (i.e. the bankruptcy trustee) obtained a $2.8 million legal malpractice judgment against Mike Cullen in a California state court action, *Cullen v. Nemeth, Western Assurance Co., Inc., J.D. Connors, Western Assurance Co. of Indiana, et al.,* Superior Court of California, County of Sacramento, No. 503773.[33] Connors/CCG argues that Nemeth/Western obtained a judgment on the theory that Cullen's malpractice caused it "to lose everything they seek to recover in this case," a position that somehow is inconsistent with its position in the case at bar. Defs.' Br. at 33. We

---

**31.** The parties have not requested a determination on whether PCX, Inc., or Bert's Bar constitute partnership segments, nor did they attempt to address the matter at the damages trial.

**32.** We also afford some deference to Connett's opinion that the FICA recovery project provided start-up funding for the TJTC segment, which supports the conclusion that J.D. Connors was a partner in that operation who effectively contributed funds to the segment. Connett's opinions regarding the proper overhead allocation carries more weight than those of Jerald Roman, who is neither a CPA nor a reliable witness.

**33.** Mike Cullen functioned as Western's corporate counsel. He originally filed the California action against Nemeth/Western for attorney's fees. Nemeth/Western countered with claims for legal malpractice, breach of fiduciary duty, fraud and constructive fraud. Cross-claims also developed between Nemeth/Western and Connors/CCG regarding the funds (res) held in escrow in this court. We enjoined the cross-claims between Nemeth/Western and Connors/CCG in the California action since they involved the same res at issue in this action, a decision affirmed by the Seventh Circuit. *See Western Assurance Co. v. J.D. Connors,* No. 93–2400, 1994 WL 109267 (7th Cir. Mar.31, 1994) (unpublished). The original action between Cullen and Nemeth/Western apparently proceeded to jury trial, with Nemeth/Western obtaining a $2,812,489.80 judgment against Cullen on the legal malpractice claim on March 14, 1994.

find Connors/CCG's judicial estoppel contention unavailing, as the position that Nemeth/Western prevailed upon in the California litigation is not inconsistent with its attempt to recover damages in this case.

 Judicial estoppel is an equitable doctrine " 'provid[ing] that a party who prevails on one ground in a lawsuit cannot turn around and in another lawsuit repudiate the ground.' " *Ogden Martin Sys., of Indianapolis, Inc. v. Whiting Corp.,* 179 F.3d 523, 526–27, n. 1 (7th Cir.1999) (*quoting McNamara v. City of Chicago,* 138 F.3d 1219, 1225 (7th Cir.), *cert. denied,* 525 U.S. 981, 119 S.Ct. 444, 142 L.Ed.2d 398 (1998)); *accord United Rural Elec. Membership Corp. v. Indiana Michigan Power Co.,* 716 N.E.2d 1007, 1010–11 (Ind.Ct.App. 1999). Federal law governs the applicability of judicial estoppel principles in diversity of citizenship cases. *Id.* Judicial estoppel seeks "to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories." *Id.* (*quoting Levinson v. United States,* 969 F.2d 260, 264 (7th Cir.1992)). Our circuit has recognized that while the doctrine avoids a mechanistic operation, certain prerequisites govern its application: (1) the later position must be "clearly inconsistent" with the earlier position; (2) the facts at issue should be the same in both cases; and (3) the party to be estopped must have convinced the first court to adopt its position. *Id.; cf. Medcom Holding Co. v. Baxter Travenol Lab., Inc.,* 984 F.2d 223, 228 (7th Cir.1993) (discussing inconsistent positions in the context of election of remedies, noting tendency of litigants to mislabel alternative remedies as inconsistent).

 Connors/CCG fails to advance a cogent explanation for why the legal malpractice claim in the California action is clearly inconsistent with Nemeth/Western's attempt to recover its existing 50% partnership interest from Connor/CCG in this case. On the contrary, we repeatedly have admonished the parties that their inattention to legal form and discipline, presumably due in part to Cullen's malpractice, resulted in the chaos now before us. Our imposition of a constructive partnership upon the business interactions of the parties directly flows from, and is consistent with, the claim that Cullen failed to advise Nemeth/Western in a reasonable fashion. Indeed, Nemeth/Western primarily asserted in the California complaint that Cullen's negligence contributed to this court's conclusion that the hospital and FICA projects were part of the 50/50 partnership.

Nemeth/Western has not repudiated its California malpractice claim either in theory or in practice by attempting to ascertain the value of the 50% partnership interest to which it is entitled in this case. It may be true that Nemeth/Western sought to recover from Cullen a portion of the value of its actual 50% partnership interest, including an amount equivalent to the funds deposited in escrow and any funds that J.D. Connors retained in excess of his partnership share. It also may be true that Nemeth/Western attempted to recover from Cullen even more than the value of his actual 50% partnership interest given the theory that but for his malpractice, Nemeth/Western would have retained ownership of the half of the business forfeited to J.D. Connors. But this is the nature of attempting to determine the extensive damages in a malpractice action, and such a negligence theory does not stand in tension with the fact that Nemeth/Western is still entitled to an equal share of the partnership, even if it has retained a judgment against Cullen for a portion of this same loss. Moreover, from an equitable standpoint, we do not regard Nemeth/Western as a "chameleonic litigant[ ]" who has manipulated the judicial process in the hopes of prevailing twice on opposite theories.

 The more applicable argument that Connors/CCG fails to raise is that Nemeth/Western would double recover if it collected upon both the California judgment and a judgment in this case. It appears undisputed that if Nemeth/West-

ern had received full satisfaction of its California judgment, it would have recovered from Cullen at least a portion of the same FICA and hospital funds it seeks in this case. In the California action, Nemeth/Western estimated that Cullen's malpractice resulted in the following damages/losses: $1.5 million in profit from the hospital recovery project, $245,000 in FICA revenues sent to the Indiana escrow account, over $700,000 in FICA revenues retained by J.D. Connors, and over $500,000 in litigation costs.[34] However, the distinction between *obtaining* two judgments governing the same losses and being able to *execute* on those judgments to obtain final payment is of real significance. Our circuit has recognized the distinction:

> Here, although [plaintiff] is now armed with two judgments [for the same loss], one against Rossini and the one we affirm today against Ellis, the law is clear that [plaintiff] is entitled to but one satisfaction. Thus, we conclude that when [plaintiff] executes on the judgment against Ellis (and we assume as much since it appears from the record that Rossini is judgment proof) and collects the $32,000, [plaintiff] will be precluded from a double recovery since Rossini could seek relief for the default judgment against him under Rule 60(b)(5) Fed.R.Civ.Proc., allowing for relief where the judgment has been "satisfied."

*Moseley, Hallgarten, Estabrook & Weeden, Inc. v. Ellis*, 849 F.2d 264, 272 (7th Cir.1988); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 49, cmt. a ("Double recovery is foreclosed by the rule that only one satisfaction may be obtained for a loss that is the subject of two or more judgments."); *Gill & Duffus Servs., Inc. v. A.M. Nural Islam*, 675 F.2d 404, 404–05 (D.C.Cir.1982) (obtaining an unsatisfied judgment against one of three individuals did not preclude a second action against the other two).

In this case, the record indicates that Mike Cullen is judgment proof, as he filed bankruptcy following the 1994 verdict and received a discharge in due course. None of the parties even vaguely suggests that Nemeth/Western will obtain satisfaction of that $2.8 million judgment, save for the $13,000 Cullen has transferred to Western. However, recovery of that $13,000 does pose a risk of double recovery if Nemeth/Western obtains satisfaction of the judgment in this case.[35] Accordingly, we exercise our equitable discretion in this case to reduce Nemeth/Western's judgment by $13,000 in order to avoid compensating it for the same loss twice.

### V. Conclusion: Disbursement of FICA Escrow Fund and Final Calculations

The FICA escrow fund maintained by the court will total $525,388.23 as of Janu-

---

**34.** We express no opinion on the accuracy of these figures or on the component elements of the California jury's damage award of approximately $2.8 million. However, it is relatively clear that if the jury awarded Nemeth/Western $1.5 million in hospital revenues, the value of the full escrow fund, and other FICA revenues retained by J.D. Connors, this total amount would include some portion of Nemeth/Western's 50% partnership interest in the hospital and FICA recovery projects.

**35.** We have no way of knowing which component of the jury's damage award this $13,000 satisfied. Yet, almost $2.5 million of Nemeth/Western's $2.95 million damages estimation pertained to hospital profits and FICA revenues that were deposited into escrow or

retained by J.D. Connors. The magnitude of the judgment itself makes it highly likely that the escrow funds in this case and any money Connors/CCG must disgorge constitute the same funds for which Nemeth/Western received a judgment in the California case. Our calculation of the parties' 50% share of the FICA business ($336,305 to Nemeth, $30,892 to Connors) demonstrates that a distribution of the escrow fund on that basis alone would have resulted in a double recovery if both judgments were satisfied fully, as Nemeth/Western requested the FICA escrow deposits as damages in the California litigation and likewise have requested the FICA escrow deposits as damages in this case as well.

ary 20, 2000, the maturity date of the 90–day United States Treasury Bills in which the FICA funds are invested. The escrow funds shall be used to satisfy partnership debts in the following order:

(1) this court's administrative Registry Fee, totaling $19,932.07, and National City Bank's Safekeeping Fee, totaling $80;

(2) the Special Master's remaining fee for services rendered, without interest,[36]

(3) $336,305 to Nemeth/Western (i.e. the bankruptcy trustee) and $30,892 to Connors/CCG.

In the likely event that the remaining FICA escrow funds fail to satisfy the FICA amounts owed to the parties, they are entitled respectively to the following percentage of any remaining FICA funds: 91.587% to Nemeth/Western and 8.413% to Connors/CCG. Nemeth/Western's escrow recovery is also subject to various attorneys' fees liens which have been made of record.

Additionally, we hold that Connors/CCG owes Nemeth/Western $725,914.64 for the hospital recovery project, which, when reduced by the $2,605 Nemeth/Western owes Connors/CCG for the TJTC/EDS project, totals $723,309.64. We also reduce Nemeth/Western's recovery by $13,000 to prevent double compensation for the same loss.[37] Therefore, Nemeth/Western's final recovery from Connors/CCG totals $710,-309.64.

**FINAL JUDGMENT AND DAMAGES AWARD**

As explained in the accompanying Entry in the above-named cause, damages are awarded in favor of Plaintiff, Western Assurance Company, Inc., and Third–Party Defendant, Martin Nemeth, and against Defendants, J.D. Connors and Connors Consulting Group, Inc., et al., in the amount of $710,309.64. The funds in the escrow account shall be disbursed according to the terms set forth in the accompanying Entry.

---

**36.** We note with appreciation Deloitte & Touche's efforts as Special Master in this difficult case; its work product provided a valuable resource in the court's analysis as explained in this entry. In addition to fees exceeding $100,000 previously awarded to the Special Master, we have received a 1998 pre-trial fee submission in which Deloitte & Touche estimates additional costs and fees of $147,755.01. (We are informed that the Special Master previously had agreed to accept $90,900 as part of a settlement that the parties failed to consummate, so that figure no longer is operative or relevant.) We anticipate awarding the Special Master this amount, plus fees covering its trial testimony, but we have expressly withheld an award of interest on this amount. While Deloitte & Touche's report provided helpful analysis, in our view it left significant areas incomplete and undeveloped, necessitating substantial additional work by the court to resolve the FICA matters. Likewise, the Special Master's testimony at trial, usually the most important component in providing services to a court, demonstrated a disappointing unfamiliarity with the report that had commanded a sizeable fee to produce. In light of these circumstances, we regard an interest award as inappropriate in this case.

**37.** We reduce Nemeth/Western's hospital project recovery simply because that figure is not variable at this point, unlike the escrow fund balance.